Mr. Justice Hagner
delivered the opinion of the court:
This is an action brought by the pláin tiffs, co-partners, against the defendants, to recover damages for an illegal entry into the close of the plaintiffs, and for abusive conduct and injuries to them and their property during the trespass. In the course of the trial, the action was discontinued as to Breithbarth and judgment was rendered against Steinle for $175. The defendant has moved for a new trial upon all the usual grounds; that the verdict is contrary to the evidence; excessive damages; evidence insufficient in law to sustain the verdict; and for errors of law in the rulings of the justice. There were some half a dozen prayers offered by the plain *340 tiffs, which were granted, and fourteen offered by the defendants, which were refused. We shall not go into a detailed examination of the various propositions of law thus presented, but shall notice only such as we conceive to be properly involved.
The admitted facts are, that the defendant, Frederick Steinle, was carrying on business as a baker and confectioner, at 119 Pennsylvania Avenue, southeast; that on the first day of December, 1885, he leased his shop and sold out his stock to the plaintiffs for a sum in cash and three promissory notes, bearing date December 1, 1885, and payable in two, four and six months, respectively, secured by a deed of trust to George Breithbarth and Fred C. Gieseking, authorizing them to take possession of the goods and chattels and sell the same on failure to pay either note, &c. On the same day Steinle executed to the plaintiffs a lease of the premises consisting of the shop room and cellar on Pennsylvania Avenue and the stable in the rear on B street, at the monthly rental of thirty-five dollars for the first year and forty dollars for the remaining two years, reserving the private entrance through the doorway of the premises on Pennsylvania Avenue, for the exclusive use of himself. As it was supposed at the time, the United States might purchase the property in this and the adjacent square for the proposed Congressional Uibrary, it was provided in the lease that in the event of the purchase of said premises by the United States, during the first year, the party of the first part consented to pay said parties of the - second part the sum of two hundred dollars, to be in full satisfaction of all claim for damages or loss that might result from said parties of the second part being compelled to move and surrender said premises; and if, within the second year, the sum of one hundred dollars upon compulsory surrender, as aforesaid; and if, within the third year, said parties of the second part covenanted to surrender said premises without any compensation or return for any loss or interference in their said business.
The government did not purchase the property, but in May, 1886, it commenced proceedings to acquire the land by *341 condemnation. The verdict of tlie jury was conditionally confirmed in June, and finally confirmed in July, 1887, and in September of that year the money was deposited in the registry of this court to be paid to the parties entitled. The plaintiffs gave evidence that the first two notes were paid at maturity; and that on the third' note falling due the defendant Steinle went to the bakery and began to talk about the last note with the plaintiff, Henry Gross, and in that conversation the defendant said: “ I owe you a right smart sum of money and we will just leave that note go off on the money that I owe you; ” that the plaintiffs further testified that the defendant did owe them money, because of the covenants of the lease in regard to the purchase of the property by the United States, and that shortly after the plaintiff had leased the premises there were some repairs needed, and the defendant told the plaintiff he would allow them full value for the repairs made in the event the government took the property; that after the note became due Steinle told them not to worry about it, that everything would be made right; that on a Friday morning, Breithbarth, one of the trustees, came in about half past eight o’clock; that both the plaintiffs were in the store and Breithbarth held the note up in front of his face and said, “look here, are you going to pay this note; ” that said plaintiff replied, “I thought that note was all settled up; Mr. Steinle settled with us; ” that Breithbarth then said, “well, I ain’t got much time to fool here; if you don’t pay this note we will clean you right out; ” that said Breithbarth had an auctioneer and several men there to move the things out of the ice cream saloon, and take possession of the place; that a wagon was outside; that Henry Gross tried to persuade Breithbarth the note was paid, but he said “no, I am ordered from Mr. Steinle,” and showed said Henry a paper, the purport of which said Henry did not understand, with Mr. Steinle’s name on it, and said that Mr. Steinle sent him there, and he had to get the money; that said Henry said to Breithbarth ‘.‘you ought to give us a little notice on this note,oughtn’t you; I don’t think you are acting right;” Breithbarth said, ‘ ‘evidently you boys don’t know nothing about law;” *342 , that plaintiffs were all worked up, and'Henry jumped over the counter and locked the door 'to keep Breithbarth from taking the things out; that in the meantime somebody had gotten a policeman in the back way (but plaintiffs did not know whether this policeman was Mr. Blandford or Sergeant Daly) through the stable and yard; that there were right smart of people both in the back and front of the store; that plaintiffs asked Breithbarth to give them a little time, and said that plaintiff Henry would get the money; and he gave plaintiffs time until the evening, but they ‘ ‘had to lock the store up at once; ’ that said Henry got the money, but it was too late to settle that evening,so on Saturday morning plaintiff went down to Breithbarth and Gieseking and wanted to pay the note; that Gieseking said that Breitbarth was out of town; that said Henry said, “well, they have been so strict with us we don’t like to pay the note without Mr. Breitbarth’s signature; ” that plaintiffs then came out of the bank and met Mr. Fields, Steinle’s lawyer, and told him they did not like to pay the money until they had Mr. Breithbarth’s signature, and he said, “well, if you don’t pay up right away we will go and sweep you out; ” that plaintiffs got scared and paid the note; that their business was run down the next day; that Barber & Hamilton came up there after a bill of fifty-four dollars, and they received notices which had on them “ please remit,” which never had been sent to the plaintiffs before; that their creditors had heard about this occurrence and came right in on them with their bills; that plaintiffs continued their business until compelled by the Government to get out, in September or October. The deed of trust given in evidence contains, among other things, a conveyance of a horse and wagon and all the goods and chattels in the store of the plaintiffs. On cross-examination the witness, Henry Gross, when asked as to his temper on this occasion, admits he was very much worried and so much excited that he does not know what everybody said exactly; that he picked up a weight and threatened to throw it at Breithbarth and told him if he undertook to unlock the door he would injure him; that Breithbarth did not attempt to withdraw the bolts and pull open the door; that plaintiff put *343 the key in his pocket after he locked the door, and does not know whether he then went back to the counter or not, but did not take up a scale weight and say, “God damn your soul, if you don’t get out I will knock your brains out; ” that not to his knowledge did he go back or upstairs' for anything else, nor pick up anything else but a scale weight, nor try to hurt Mr. Breithbarth when he tried to open the door, but plaintiff was so excited he did not know what he was doing; that he may have done so, but not to his knowledge; that plaintiff went into the back part of the store to get a letter that Mr. Steinle had written to him; that the note was to come off of the bill for all the money that he owed plaintiff; that during all the time Breithbarth and the men were standing around there talking; that plaintiff was so excited that he did not know what Breithbarth was doing; that plaintiff looked out while Breithbarth was trying to get the policeman in; that plaintiff could not say whether any of these people were in front of the store, but they were on the pavement; that plaintiff subsequently unlocked the door, but don’t know why; that plaintiffs promised to pay the note at four o’clock, and did pay it the next day, because they were afraid that they would clean them out; the plaintiffs did not pay their rent for the months of July and August; that Breithbarth did not go away until plaintiffs promised to .pay the note; that when Steinle asked about the July or August rent plaintiffs gave as their reason for not paying that the government had condemned the property, to which Steinle made no answer; that plaintiff stopped him the next day and Steinle told him that he was entitled to the rent, and that he could give plaintiffs seven days’ notice and then kick them out, and then went off; that this was the last notice, and that Steinle never afterwards demanded the rent nor asked for anything. That is about the amount of the testimony given by Henry Gross, who is the only one of the plaintiffs who testified to this occurrence. The only other witness for plaintiff was Daly,-who said: “that he was on B street and some parties came to him and told him that somebody was going to be shot if he did not hurry up; that he went over in *344 the yard and stood there and nobody called his attention to anything that was any of his business there; that he stood there and looked in; that some men were talking, but he did not know anything about it; that Officer Blandford was with him; that he saw no disturbance there, no crowd in front, and nothing in the nature of a disturbance; that Breithbarth did not send for him, and he don’t know who sent; that witness was in the rear and could not see any crowd out front; and that he saw no wagons out there.” And there they rested their case.
A number of witnesses were called on behalf of defendant. The first was Breithbarth, who testified that on the evening of the 19th of August he was told by Mr. Steinle to forclose the trust; that the note had been due since the 4th day of June; that the deed of trust authorized the trustee, in the event of the non-payment of either of the notes at maturity, to take possession of the property and sell it; that the trustees were also-authorized to do the same thing if the rent was not paid, and two months’ rent was unpaid at that time; and the trustees were also authorized to take possession of the property if any of it was taken away; and a wagon and harness included in the deed of trust had been removed. Breithbarth says he went there in company with his co-trustee, who had the note, and showed it to Henry Gross, and asked him for payment; that he refused payment in a very offensive way, and used very intemperate language and abused the trustees. He gave no excuse for not paying it, and never said a word about its having been paid, or claimed he was entitled to credit on account of a settlement with Steinle. Steinle was examined and said he never made any such agreement as that referred to by the. plaintiff; but he did say, however, when they were quarreling about paying the rent that the government was about to take the property; that he understood by the lease that if the premises were condemned by the government for a library site, he would allow the plaintiffs two hundred dollars; but that they were to pay their rent up to the time the money was paid; that four persons were present, when Breithbarth went to enforce the trust; that they did take a wagon up there,, *345 but kept it around the corner about two hundred and. fifty feet from the premises; that no wagons were in front of the store; that he, Darr and Tolson went to the store, found the door 'open and no one making any objection to their entering, they quietly walked in; there was no crowd there, and when he went in and demanded payment of the note, Gross swore and said that he would not pay it, and Breithbarth told him there was nothing left for him to do except to enforce the trust;, that Gross said he should not take anything out of the store, and then Breithbarth walked toward the front door to call the wagon, but could not see it; that he then went back and Gross swore again that he should not take anything out, and slammed the door and put the key in his pocket; that Breithbarth attempted to unlock it, and that Gross then said to him that if he unbolted the door he would kill him; the abusive language used by him is stated in the record; that Breithbarth then noticed that Darr had gone out, and he and Tolson were alone in the store with the plaintiffs; that Gross-was cursing and swearing all the time and making all the noise he could; that Breithbarth talked in a very respectful way to the plaintiffs, according to his testimony, which is set out at some length in the record.
As one of the grounds for a new trial is that the verdict was against the evidence we have given it at this length. The plaintiffs’ case depends upon the existence of the alleged agreement to which the plaintiff testifies, but which Steinle positively denies; while Breithbarth declares there was never a word said about it when he went there to enforce the deed of trust. It is only necessary to say one word here about the claim of the plaintiff to the two hundred dollars. The terms of the lease were that if the Government should purchase the property, and the plaintiffs should be deprived thereby of its use, there was to be a payment by the defendant of two hundred dollars to make up the losses they might sustain by the breaking up of their business.
The defendant, Steinle, says his understanding was that they were only to be paid in case the United States actually took the property and paid for it, and the $200 was only to *346 be paid them at the time the government should take the property and pay for it; he did not intend to admit at any time when he had conversations with the plaintiffs that there was any indebtedness on his part .of two hundred dollars; though he admitted he would owe them two hundred dollars in the future.
In point of fact we know there was no certainty thegovernment would take this property, even after proceedings had been had. The condemnation proceeding was nothing but an offer to the party in whose favor the money would be paid on condemnation, though of course the government would have to pay damages for any loss suffered by the parties whose property had been injured by condemnation proceedings. 10 Howard, 396.
Undoubtedly the weight of testimony is against the existence of the alleged agreement at all, and the payment of the note by the plaintiffs the next day would indicate their want of confidence and belief in its existence. But if the agreement had been made as alleged, it would have been utterly void, for it was wholly without consideration as it gave no possible benefit to Steiiile.
It is also claimed that Steinle agreed to postpone the collection of the note. But the note was due- in June, and the two hundred dollars were only to be paid in case of condemnation, and the condemnation proceedings and surrender of the premises did not take place until September or October. The prayer of the plaintiffs, which was intended more particularly to raise the question of failure by defendants to perform the alleged agreement, was improper, because it left to the jury the determination of that question without any explanation from the court. We think the justice should have instructed the jury that the agreement, even if the jury should find it was made, was not one the law could sustain.
The trustees were appointed in the deed to protect the interests of both parties. The beneficiary in the deed of trust had a right to call on the trustees to perform their duty. The July rent was unpaid, and the plaintiffs were charged *347 with having taken and moved certain of their property ont of the jurisdiction of the court; and the trustees would have been liable for any loss that might have accrued to the beneficiary if they had refused under his instructions to execute the trust.
• Of course Breithbarth could have been held answerable if he had abused his power in the execution of his trust in a manner injurious or detrimental to the interests of the party grantor; but the plaintiffs dismissed their suit against Breithbarth.
Appealed to, upon the testimony in the case to determine whether the verdict is justified by the evidence, and against the weight of the evidence, we have no hesitation i n saying we think that the weight of the evidence is in favor of the defendants. There is no proof whatever of any actual injury to the plaintiffs or their property. On the contrary, we think Henry Gross well deserved to have been punished for his violence on the occasion.
The court instructed the jury if they should find from the evidence that Steinle had acted in a willful and shameful manner, the plaintiffs were entitled to vindictive or punitive damages. But as there was really no harm done by the defendant, nor a particle of property touched, and as all the violence was really done by Henry Gross himself, there would have been no justice if any damages should be given and they should be no more than simply nominal. The instruction thus given by the court was therefore not justified by the evidence and was improper.

The judgment below is reversed and a. new trial granted.